PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-1818
_____

IN RE: WALMART INC. SECURITIES LITIGATION

KIM KENGLE AND ROSEANNE LACY,
Appellants

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 1:21-cv-00055)
District Judge: Honorable Colm F. Connolly
_____

ARGUED: April 17, 2025

Before:  CHAGARES, *Chief Judge*, SCIRICA, and
RENDELL, *Circuit Judges*.

(Filed: August 29, 2025)

Sara Fuks [ARGUED]
Rosen Law Firm

275 Madison Avenue
40th Floor
New York, NY  10016

*Counsel for Appellants*

Sean M. Berkowitz
Nicholas J. Siciliano
Latham & Watkins
330 N Wabash Avenue
Suite 2800
Chicago, IL 60611

Ben Harris
Latham & Watkins
1271 Avenue of the Americas
New York, NY 10020

Roman Martinez [ARGUED]
Latham & Watkins
555 11th Street NW
Suite 1000
Washington, DC 20004

Whitney Weber
Latham & Watkins
505 Montgomery Street
Suite 2000
San Francisco, CA 94111

Robert W. Whetzel
Richards Layton & Finger
920 N King Street

One Rodney Square
Wilmington, DE 19801

    *Counsel for Appellees*

---

OPINION OF THE COURT

---

**SCIRICA**, *Circuit Judge*

This is a case about whether and when it is misleading for a company to omit a pending government investigation from a disclosure of its "reasonably possible" liabilities. From 2016 to 2018, the United States Attorney's Office for the Eastern District of Texas investigated Walmart over its pharmacies' opioid dispensation practices. While prosecutors ultimately did not bring an indictment, Walmart's share price dropped in 2020 after *ProPublica* published an article about the investigation.

Plaintiffs, Walmart investors, brought a putative securities fraud class action, contending Walmart had not sufficiently disclosed the investigation in certain annual and quarterly filings. The District Court granted Walmart's motion to dismiss and denied plaintiffs' motion for leave to amend, finding no misrepresentation or omission of material fact in those filings, and plaintiffs appealed. Because we agree with the District Court that Walmart's statements were not misleading, and Walmart's disclosures as the investigation progressed were sufficient, we will affirm.

## I.

We draw the following facts from the Second Amended Complaint, which we accept as true for the purpose of our review of the grant of the motion to dismiss. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206, 210 (3d Cir. 2009). For our review of the court's denial of plaintiffs' motion for leave to amend, which we discuss later, we accept as true the facts in the Proposed Third Amended Complaint.

## A.

Walmart operates a network of 5,000 pharmacies across the country which dispense controlled substances, including opioids.[1] As a distributor of controlled substances, Walmart is subject to the Controlled Substances Act ("CSA"), which regulates the manufacture, distribution, and use of certain drugs. Violations of its requirements can carry heavy penalties. Walmart "obtained a heightened awareness of its obligations" under the CSA, plaintiffs claim, when Walmart entered into a memorandum of agreement ("MOA") with the Drug Enforcement Agency ("DEA") in 2011 "to resolve a DEA administrative action." App. 81. This MOA covered all Walmart stores until 2015 and imposed various compliance and monitoring requirements.

---

[1] This case arises in the wake of the opioid epidemic, "one of the largest public health crises in this nation's history." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 209 (2024) (citation omitted). Its tragedies are too many to recount here.

In late 2016, "federal prosecutors began investigating two Texas doctors (Howard Diamond and Randall Wade) who were prescribing vast amounts of opioids." App. 121. The DEA raided a Texas Walmart store that December seeking records concerning Diamond and Wade. This raid alerted Walmart that it was part of a criminal investigation. In March 2017, an Assistant United States Attorney ("AUSA") in the Eastern District of Texas ("EDTX"), Heather Rattan, "issued an email search warrant to" Walmart "related to documents involving certain pharmacists in Texas." App. 124. Rattan "expanded the search warrant" to Walmart's "dispensing controlled substances generally" in June 2017. *Id.* Walmart received "broad document demands" from another AUSA in EDTX in November 2017, who told Walmart "he was conducting a parallel civil investigation." App. 124–25. EDTX also issued several DEA administrative subpoenas during these investigations.

"[O]n March 28, 2018, AUSA Rattan informed Walmart of her intention to indict the Company." App. 125. Walmart "immediately requested a meeting with" EDTX prosecutors to "resolve any criminal and civil proceedings in one shot," which prosecutors granted. App. 125. The meeting occurred in April 2018, but did not resolve "whether [Walmart's conduct] justified a criminal charge." App. 126. Walmart met with EDTX again on May 3 and 4, 2018, where prosecutors told Walmart they would "imminently indict the Company" unless Walmart agreed to a billion-dollar settlement. App. 127 (emphasis deleted). In a fourth meeting on July 2, 2018, prosecutors reaffirmed their intent to bring an indictment. As before, prosecutors agreed to postpone any indictment to allow Walmart time to present its case to prosecutors, which Walmart did on July 26.

After further discussion between Walmart and EDTX, a prosecutor from the Department of Justice's ("DOJ") headquarters "directed Walmart's counsel to present Walmart's submission" about the propriety of an indictment "to the Criminal Division" on August 10, 2018. App. 130. Seemingly satisfied, "the DOJ informed Walmart it was then declining to criminally prosecute the Company" on August 31, 2018, and later also "declined to permit a criminal prosecution" by EDTX. App. 131–32. EDTX told Walmart a civil investigation for CSA violations would continue, however, and it did.

*ProPublica*, an investigative journalism nonprofit, published an article on March 25, 2020, titled "Walmart Was Almost Charged Criminally Over Opioids. Trump Appointees Killed the Indictment," detailing EDTX's attempts to bring the case and DOJ's ultimate declination to indict. App. 872. The article "disclos[ed] . . . that the Department of Justice had been criminally investigating Walmart for violating the CSA and related laws . . . since 2016," that Walmart entered into an MOA with the DEA in 2011, and other DEA actions previously taken against Walmart. App. 179. Walmart shares dropped about 5% after publication. "On December 22, 2020 . . . the DOJ announced . . . it had filed a lawsuit against Walmart," alleging civil violations of the CSA. App. 181. "That civil case," according to Walmart, "remains ongoing." Appellee's Br. 9. After the announcement, "Walmart's stock price fell $2.75 per share, or 1.88%, over the next two trading days." App. 183.

B.

6

Plaintiffs claim thirteen of Walmart's securities filings through the class period (March 31, 2017, through December 22, 2020) wrongfully omitted or misrepresented the investigation.[2]  The first set of filings we will discuss is from the beginning of the class period to Walmart's 10-K filed in 2018.  The first filing in this set is Walmart's 10-K for the 2016 fiscal year, filed in March 2017.  The 2016 10-K included a "Contingencies" section, which stated as follows:

> The Company is involved in a number of legal proceedings. The Company has made accruals with respect to these matters, where appropriate, which are reflected in the Company's Condensed Consolidated Financial Statements. For some matters, a liability is not probable or the amount cannot be reasonably estimated and therefore an accrual has not been made. However, where a liability is reasonably possible and may be material, such matters have been disclosed.

---

[2] There are two types of SEC filings at issue in this case: 10-Ks and 10-Qs.  Form 10-K is an annual report prepared "according to a set of accounting standards, conventions and rules known as Generally Accepted Accounting Principles, or GAAP" and includes information on the company's business, risk factors it faces, legal proceedings, its governance, and more. *How to Read a 10-K/10-Q*, U.S. Secs. & Exch. Comm'n (Jan. 25, 2021), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/how-read.  Form 10-Q "provides similar but more abbreviated disclosure than the Form 10-K and as it relates to the applicable fiscal quarter." *Id.*

App. 154–55 (emphasis deleted).[3]    The same disclosure appears in Walmart's first-quarter 2017 10-Q, filed June 2, 2017; its second-quarter 2017 10-Q, filed August 31, 2017; and its third-quarter 2017 10-Q, filed December 1, 2017.  Plaintiffs allege by the time Walmart filed its 2016 10-K, Walmart "had learned of the Criminal Investigation" and was "aware that a material liability . . . was at least reasonably possible."  App. 155.  And by the time of the third quarter 2017 10-Q, Walmart was "aware that EDTX DOJ was conducting a parallel civil investigation."  App. 156.  None of the disclosures in this period referred to the CSA investigations at issue here.

Walmart's next regular filing was its 10-K for the fiscal year of 2017, filed on March 30, 2018.  This was the first filing after AUSA Rattan informed Walmart of her intent to bring an indictment on March 28.  The 2017 10-K's "Contingencies" section led with the same language as above.  This form included for the first time a section titled "National Prescription Opiate Litigation."  App. 157–58.  Most of the section was devoted to *In re Nat'l Prescription Opiate Litig.*, the multidistrict litigation ("MDL") that was centralized in the Northern District of Ohio in December 2017.  The discussion of the MDL read as follows:

> In December 2017, the United States Judicial Panel on Multidistrict Litigation ordered consolidated numerous lawsuits filed against a wide array of defendants by various plaintiffs,

---

[3] This language is standard in public company annual filings.  *E.g.*, Apple Inc., Annual Report (Form 10-K) 26 (Nov. 1, 2024).

> including counties, cities, healthcare providers,
> Native American tribes, individuals, and third-
> party payors, asserting claims generally
> concerning the impacts of widespread opioid
> abuse. The consolidated multidistrict litigation is
> entitled *In re National Prescription Opiate
> Litigation (MDL No. 2804)*, and is pending in the
> U.S. District Court for the Northern District of
> Ohio. The Company is named as a defendant in
> some of the cases included in this multidistrict
> litigation, including cases filed by several
> counties in West Virginia; by healthcare
> providers in Mississippi, Alabama, Texas, and
> Florida; and by the St. Croix Chippewa Indians
> of Wisconsin. Similar cases that name the
> Company have been filed in state courts by
> various counties and municipalities; by health
> care providers; and by various Native American
> Tribes. The Company cannot predict the number
> of such claims that may be filed, and cannot
> reasonably estimate any loss or range of loss that
> may arise from such claims. The Company
> believes it has substantial factual and legal
> defenses to these claims, and intends to defend
> the claims vigorously.

App. 157.  Like previous statements, this one did not reference the ongoing investigations into Walmart's controlled substances dispensing practices.

The next set of disclosures begins with Walmart's first-quarter 2018 10-Q, filed June 4, 2018—Walmart's first regular filing after meeting with federal prosecutors, who confirmed

EDTX's intent to eventually bring an indictment.  This filing included the same disclosure regarding material liabilities discussed *supra*, again at the top of the "Contingencies" section, but the subheading dedicated to the MDL now read "National Prescription Opiate Litigation *and Related Matters*." App. 159 (emphasis added).  This section now included the following statement, which we italicize, disclosing the then-ongoing government investigations of Walmart's opioids practices:

> In December 2017, the United States Judicial Panel on Multidistrict Litigation ordered numerous lawsuits filed against a wide array of defendants by various plaintiffs be consolidated, including counties, cities, healthcare providers, Native American tribes, and third-party payors, asserting claims generally concerning the impacts of widespread opioid abuse. The consolidated multidistrict litigation is entitled *In re National Prescription Opiate Litigation (MDL No. 2804)*, and is pending in the U.S. District Court for the Northern District of Ohio. The Company is named as a defendant in some of the cases included in this multidistrict litigation. Similar cases that name the Company have been filed in state courts by various counties and municipalities; by health care providers; and by various Native American Tribes. The relief sought by various plaintiffs is compensatory and punitive damages, as well as injunctive relief including abatement. The Company cannot predict the number of such claims that may be filed, and cannot reasonably estimate any loss or

range of loss that may arise from such claims. The Company believes it has substantial factual and legal defenses to these claims, and intends to defend the claims vigorously. *The Company has also been responding to subpoenas, information requests and investigations from governmental entities related to nationwide controlled substance dispensing practices involving the sale of opioids. The Company can provide no assurance as to the scope and outcome of these matters and no assurance as to whether its business, financial condition or results of operations will not be materially adversely affected.*

*Id.* (emphasis added). Walmart's 10-Q and 10-K forms for the remainder of the class period included the same disclosures relevant to contingencies, the opioids crisis, and opioids-related litigation. One form—the 2019 10-K—additionally disclosed that Walmart had been responding to investigative demands from the Federal Trade Commission and Middle District of Pennsylvania regarding its consumer fraud and anti-money laundering procedures and noted Walmart did not believe the matters would have a material adverse effect but could provide no assurances to that end.

C.

A putative class of plaintiffs, owners of Walmart stock during the class period, brought a securities fraud lawsuit in January 2021 against Walmart, Walmart CEO Douglas McMillon, and Walmart CFO Brett Biggs in the District of Delaware. Plaintiffs alleged Walmart's disclosures during the

class period either omitted entirely or made insufficient reference to the EDTX investigation, violating Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. They also sought to impute liability to McMillon and Biggs under Section 20(a) of the Securities Exchange Act, which provides for "controlling person" liability.

Plaintiffs advanced several theories of fraud, but only two are relevant here. First, they contended Walmart's statement that it disclosed all reasonably possible material liabilities was misleading because it omitted the EDTX investigations, which plaintiffs contend amounted to reasonably possible material liabilities. Second, plaintiffs contended Walmart's failure to disclose the investigations violated ASC 450, a Generally Accepted Accounting Principles ("GAAP") rule mandating the disclosure of "loss contingencies" in financial statements.

The District Court appointed Kim Kengle, trustee of the Kim K. Kengle 2000 Trust, lead plaintiff. The court twice granted plaintiffs leave to amend their complaint. Walmart moved to dismiss the Second Amended Complaint in November 2022. After a series of hearings and another motion for leave to amend, which the court denied, the court granted Walmart's motion to dismiss.

The court rejected the first theory of fraud, holding there was "no legal authority for the proposition that being the subject or target of an investigation constitutes a 'liability.'" App. 19. Accordingly, Walmart's decision not to disclose the investigations before EDTX prosecutors confirmed their intent to indict Walmart "did not make the representation 'where a liability is reasonably possible and may be material, such

matters have been disclosed' false or misleading." App. 19.
And "no investor could read Walmart's disclosures" after
Walmart's 10-Q filed June 4, 2018, "without understanding
what was true—namely, that Walmart potentially faced losses
if the Investigation resulted in criminal charges or civil claims
and that the scope of any such losses was indeterminate." App.
21. The court rejected the GAAP-based theory of fraud
because Walmart "could not have known a loss 'may have been
incurred' until EDTX prosecutors told Walmart at the end of
April 2018 that they intended to indict it," and Walmart's
disclosure afterwards sufficed. App. 23.

Plaintiffs timely appealed, contending the court erred in
finding their complaint did not plausibly allege Walmart's
disclosures were misleading, and that the disclosures did not
violate ASC 450. Plaintiffs also challenge the court's denial of
leave to amend their complaint a third time, and provide a
proposed third amended complaint.

## II.

"The district courts of the United States . . . have
exclusive jurisdiction" over claims alleging violations of
Section 10(b), Rule 10b-5, and Rule 20(a). 15 U.S.C. §
78aa(a); *see also City of Warren Police & Fire Ret. Sys. v.
Prudential Fin., Inc.*, 70 F.4th 668, 679 (3d Cir. 2023). We
have jurisdiction over the court's grant of a motion to dismiss
under 28 U.S.C. § 1291. *Fowler*, 578 F.3d at 206. Our review
is *de novo*, accepting the facts alleged in the complaint and
reasonable inferences drawn therefrom as true. *Id.* at 210. To
survive a motion to dismiss, the complaint must plead "enough
facts to . . . nudge[] [plaintiffs'] claims across the line from
conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007).

"By virtue of Civil Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the 'PSLRA'), heightened pleading standards govern securities fraud claims brought under § 10(b) and Rule 10b-5." *Prudential*, 70 F.4th at 680. Rule 9(b) requires parties "alleging fraud or mistake" to "state with particularity the circumstances constituting fraud or mistake," a higher pleading standard than Rule 8. Fed. R. Civ. P. 9(b). And "any private action arising under this chapter," including § 10(b) claims, is subject to the procedural requirements of the PSLRA. 15 U.S.C. § 78u-4. "[I]n § 21D(b) of the PSLRA, Congress impose[d] heightened pleading requirements in [§ 10(b) and Rule 10b-5 actions]," which require "any private securities complaint alleging that the defendant made a false or misleading statement" to "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and "(2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal quotation marks omitted).

District courts may deny leave to amend where, *inter alia*, amendment would be futile. *Krantz v. Prudential Invs. Fund. Mgmt. LLC*, 305 F.3d 140, 144 (3d Cir. 2002). We ordinarily review denial of leave to amend for abuse of discretion, *id.*, but we review *de novo* "the underlying legal conclusion whether the proposed amendments to the complaint would have been futile," *U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-Op. Fin., Corp.*, 690 F.3d 951, 957 (8th Cir. 2012); *accord Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 309 (3d Cir. 2003) (reviewing *de novo* the district

court's underlying futility determination in its denial of leave to amend). "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). Because plaintiffs attached a proposed amended complaint, we review it in determining whether amendment might have been futile. *See In re Adv. Battery Techs., Inc.*, 781 F.3d 638, 641–42 (2d Cir. 2015).

## III.

We first address the period from March 30, 2017, the first disclosure of the class period, to June 4, 2018, immediately before Walmart's first-quarter 2018 10-Q, discussing each theory of liability in turn.[4] We then consider the period after that disclosure in Part III(C), again discussing both theories.

Plaintiffs must prove the same elements to prevail under either theory. "In cases involving publicly traded securities and purchases or sales in public securities markets," the "basic elements" for the "private damages action" implied from Section § 10(b) are "(1) a *material misrepresentation (or omission)*," "(2) *scienter, i.e.,* a wrongful state of mind," "(3) *a connection with the purchase or sale of a security*," "(4)

---

[4] We decline Walmart's invitation at oral argument to hold that these theories are interdependent, *i.e.,* that Walmart's general statements in its "Contingencies" section are "akin to a statement saying [Walmart] ha[s] satisfied [its] disclosure requirements under the accounting rule." Oral Arg. at 31:22. Accordingly, we treat them independently.

*reliance*," "(5) *economic loss*," and "(6) '*loss causation*,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).

The District Court assessed only the first element in dismissing the case, and we will do the same. The misrepresentation theory turns on whether Walmart's statement that it had disclosed all reasonably possible liabilities that may be material was misleading given its omission of the EDTX investigations. And the ASC 450 theory turns on whether accounting rules required Walmart to disclose the investigations as loss contingencies.

A.

Plaintiffs' first theory of fraud is that Walmart's disclosures before its June 4, 2018 10-Q were misleading because—without disclosing the EDTX investigations—the form stated, "where a liability is reasonably possible and may be material, such matters have been disclosed." "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under [those] provisions only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011) (quotation marks omitted) (citing 17 C.F.R. § 240.10b-5(b)). Omissions are actionable only when they render some other affirmative statement misleading. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024). Because the complaint does not plausibly allege the EDTX investigations amounted to a "reasonably possible" liability that "may be

material" during this period, this theory does not carry the day.

We start with Walmart's disclosures from the beginning of the class period until March 28, 2018. The only alleged misleading statement in this period is the general language at the top of the "Contingencies" section.

The complaint clearly alleges there was an ongoing investigation involving Walmart during this period, and that Walmart was aware of it. Walmart admits as much. But the complaint falls short in alleging Walmart's disclosures during this period were *misleading or false*—that is, that the investigation amounted to a liability that was reasonably possible and may have been material, such that omitting it made the language in the "Contingencies" section fraudulent.

The District Court disagreed with plaintiffs' contention that the investigations were a material liability, and reasoned there was "no legal authority for the proposition that being the subject or target of an investigation constitutes 'a liability.'" App. 19. Nor do we find support for that proposition, nor are we convinced the investigations here, whose initial scope only concerned the activities of two doctors, constituted a reasonably possible liability for Walmart. Plaintiffs contend "[i]n reaching that conclusion, the court refused to attach any meaningful weight to the factors which made the Investigations a material liability: namely, Walmart's violation of the MOA and Defendants' actual knowledge of Walmart's acute CSA violations." Appellant's Br. 31. We are not persuaded either of these factors converted the early-stage investigations into a reasonably possible liability. As the complaint notes, the MOA expired in 2015, making its relevance to the investigations questionable. And Walmart

took steps towards compliance after the MOA expired, like changing its pharmacy guidelines to "quot[e] the CSA and explain[] that [its regulations were] . . . the basis for nearly all criminal actions the DEA took against pharmacies," listing multiple red flags—further reducing the relevance of violations during the MOA period.  App. 80.  Defendants' "actual knowledge" of past CSA violations may bear on whether Walmart sincerely or reasonably believed the investigations did not represent a reasonably possible risk of material liability.  But plaintiffs have not adequately connected the government's preliminary and somewhat undefined investigations with these past violations, leaving unclear whether the investigations were in fact "likely to uncover [that] wrongdoing," *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 673 (M.D. Tenn. 2022), or whether "the government was on [Walmart's] trail," *Menaldi v. Och-Ziff Cap. Mgmt. Grp., LLP*, 277 F. Supp. 3d 500, 515 (S.D.N.Y. 2015).  Nor do they allege AUSA Rattan's threat of indictment in the spring of 2018 is connected to the MOA or Walmart's alleged violations of it, which nearly half of their complaint is spent describing.  In short, at this early stage, it was not plausible to infer a "reasonabl[e] possib[ility]" that EDTX's search warrants and broad document demands could be a liability, much less a loss that "may be material."

The portion of the class period where this question is closest is March 28, 2018 to June 4, 2018, between when an EDTX prosecutor told Walmart she intended to indict the company, and when Walmart's disclosures were updated.  The only potentially misleading statement plaintiffs point to during this period is, again, the general "Contingencies" language. They argue that if Walmart's statement that it had disclosed all reasonably possible material liabilities was not misleading

before, it at least became misleading after the prosecutor's communication, rendering fraudulent its March 30 10-K—the only regular filing between AUSA Rattan's communication and Walmart's June 4 10-Q, which disclosed the investigation.

But one prosecutor stating her intent to bring an indictment did not, on *these* facts, transform the investigation into a "reasonably possible," "material" liability. The same uncertainties surrounding the investigation that existed before the communication continued to exist after and until Walmart was able to meet with prosecutors, despite Walmart's proactive attempts to resolve those uncertainties. March 28 was the first time a potential indictment was mentioned, and the specifics regarding any indictment were unclear, the investigation remained ongoing, and no indictment or notice regarding the nature of any potential claims had come. To date, as far as Walmart knew, the investigation was focused on two doctors' activities. And as plaintiffs noted, Walmart "immediately requested a meeting with federal prosecutors" after AUSA Rattan's communication. App. 125. During this part of the class period, based on the facts in the complaint, we cannot see how the investigations constituted a liability or a reasonably possible liability, and thus how omitting the investigation could be misleading given Walmart's statement it had disclosed all "reasonably possible" liabilities that "may be material." Accordingly, Walmart's "Contingencies" language in its 2017 10-K—its only disclosure between the March 28, 2018 email and its disclosure of the investigation in its first-quarter 2018 10-Q—did not constitute a material misrepresentation or omission.

Plaintiffs further contend "[c]ourts across the country have routinely sustained claims under §10(b) where defendants

made affirmative statements about potential liabilities stemming from investigations or threatened legal proceedings and failed to disclose ongoing government investigations." Appellant's Br. 41. But these cases have one feature in common that is not present here—in each, the defendant made a statement not merely that they had disclosed reasonably possible liabilities, but *implying the defendant was not under investigation*, when in fact, it was. Walmart's statement, which made no reference to investigations or subpoenas—only to *liabilities*—does not resemble these disclosures. *See Menaldi v. Och-Ziff Cap. Mgmt. Grp.*, 164 F. Supp. 3d 568, 583–84 (S.D.N.Y. 2016) (holding Och-Ziff's statement that it was "*not currently subject to any pending regulatory, administrative or arbitration proceedings*" and *"may in the future"* be subject to "regulatory agency investigations, litigation, and subpoenas," was misleading because Och-Ziff had *already* been responding to subpoenas and subject to investigations  (emphasis added)); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727–28 (S.D.N.Y. 2015) (holding BioScrip's statements declining to provide any "assurance [it] will not receive subpoenas or be requested to produce documents in pending investigations or litigation from time to time" misled investors by implying BioScrip was *not receiving subpoenas* or requests for document production when it was); *Bond*, 587 F. Supp. 3d at 658 (holding Clover Health Investments' statements that it was "not aware of any government investigation or other legal proceeding that could have a material impact on its performance" and that "there were no material pending or threatened lawsuits . . . by any Governmental Authority" were misleading when Clover had received investigative demands a year prior (internal quotation marks omitted)). The Supreme Court's recent decision in *Macquarie Infra. Corp. v. Moab Partners, L.P.* explains why § 10(b) liability was appropriate

in those cases, and not here—the rule "covers half-truths, not pure omissions." 601 U.S. at 264.

Accordingly, because the complaint does not plausibly allege the investigations into Walmart constituted a liability or a reasonably possible liability, or that Walmart's disclosures implied it was *not* under investigation, plaintiffs' first theory fails through this part of the class period.

## B.

Plaintiffs' second theory of fraud is more technical. ASC 450 is a GAAP rule which requires the disclosure of certain "loss contingencies" in financial statements, and which plaintiffs contend Walmart violated by not disclosing the EDTX investigations.   Walmart does not dispute that misrepresenting a financial statement as complying with GAAP could be misleading.  17 C.F.R. § 210.4-01(a)(1); *see generally In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417–18 (3d Cir. 1997) (explaining plaintiffs can allege securities fraud by pleading defendant's "unreasonable accounting practices . . . and how they distorted the disclosed data").  We therefore assess whether the complaint plausibly alleges Walmart's disclosures violated ASC 450.  We conclude it does not.

### a.

ASC 450 generally requires the disclosure of certain loss contingencies.  A loss contingency is "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to

occur." Financial Accounting Standards Board, Accounting Standards Codification 450-10-20 [hereinafter "ASC"]. These "can include contingent contractual claims, lawsuits, environmental liabilities, and other contingent claims." 79 New York University Annual Institute on Federal Taxation § 5.08. To simplify, a loss contingency can be thought of as a liability that may occur in the future.

Not every possible loss, however, is a loss contingency, and not every loss contingency needs to be disclosed. "Under ASC 450, companies must assess whether the likelihood that a future event will confirm a loss is remote, reasonably possible, or probable," and need only disclose the event if the loss is at least reasonably possible. Eugene Goldman & Scott Taub, *Assessing Loss Contingencies From Litigation and Regulatory Exposures*, Bloomberg Law (April 2021), https://www.bloomberglaw. com/external/document/X8HJMK1O000000/capital-markets-professional-perspective-assessing-loss-continge. And where the loss contingency is litigation that is only *threatened*, there are further conditions before companies are obligated to disclose it. "Disclosure is not required of a loss contingency involving an *unasserted claim* or assessment if there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment unless . . . a. It is considered *probable* that a claim will be asserted," *and* "b. There is a *reasonable possibility* that the outcome will be *unfavorable*." ASC 450-20-50-6 (emphasis added).

"Accounting for contingent liabilities" under this rule accordingly "requires a subjective evaluation of the risk that the liability will require a payment." 79 New York University Annual Institute on Federal Taxation § 5.08; *see also* 8 Bus. &

Com. Litig. Fed. Cts. § 89:7 (5th ed.) ("No quantitative metrics are used in the codified definitions of 'probable,' 'reasonably possible,' or 'remote.' Accordingly, entities need to exercise judgement when applying the terms."); *id.* ("Pending litigation or threatened claims are among the most common loss contingencies subject to disclosure under ASC 450. Management's disclosures of or accruals for loss contingencies *related to legal proceedings* require a *high degree of judgment* and often rely on *significant assumptions*." (emphasis added)). And the rule codifies this subjectivity—ultimately, a "judgment must be made as to the degree of probability of an unfavorable outcome" if the entity judges the assertion of a claim is probable.  ASC 450-20-55-15.

b.

Plaintiffs' theory that the disclosures violated GAAP turns on whether the EDTX investigations were a "loss contingency" that Walmart was required to disclose.  We conclude at least until Walmart's June 4, 2018 disclosure, they were not.  Through this period, the complaint does not plausibly allege the investigations were definite enough in scope that any loss was at least reasonably possible.

First, on the facts alleged, the investigations appear to fall under ASC 450's broad definition of a loss contingency. They are a "set of circumstances involving uncertainty as to a possible loss to [Walmart] that [would] ultimately be resolved when one or more future events occur or fail to occur," *i.e.*, if the investigation resulted in an indictment, which in turn, could result in a settlement or penalties—all of which were uncertain through the class period.  ASC 450-10-20.  On this, the parties do not seem to disagree.

The issue here is whether the complaint plausibly alleges that before Walmart's first meeting with EDTX, Walmart judged the investigation itself to present a "reasonably possible" or "probable" loss. We conclude it does not. Plaintiffs contend ASC 450 mandated disclosure because Walmart was "aware that the DOJ manifested an awareness of a potential material claim against Walmart when it commenced" its investigation in 2016, and "it was at least reasonably possible that" the investigation "would result in . . . a material liability." App. 165–66. These arguments ignore the room for judgment that ASC 450 leaves to Walmart, and do not allege that Walmart believed that a loss *was* reasonably possible during this stage. *See* ASC 450-20-55-15.

The Implementation Guidance to ASC 450 shows why these inferences are not plausible from the facts alleged in the complaint. It explains how entities might "[a]ssess[] [the p]robability of the [i]ncurrence of a [l]oss." ASC 450-20-55. Where, as here, "the underlying cause of the litigation, claim, or assessment is an event occurring before the date of an entity's financial statements" (*i.e.*, Walmart's opioids dispensing practices), the following are "[a]mong the factors that should be considered" in assessing "the probability of an outcome unfavorable to the entity": "[t]he nature of the litigation, claim, or assessment," "[t]he progress of the case," "[t]he opinions or views of legal counsel and other advisers" to the entity, "[t]he experience of the entity [and other entities] in similar cases," and "how the entity intends to respond to the lawsuit, claim, or assessment." ASC 450-20-55-12.

Each of the factors relevant in this case cuts against Walmart's needing to disclose the investigations before or in its 2017 10-K on March 30, 2018. The "nature of the . . . claim"

here was an investigation broad in scope, pursuing a yet-uncertain theory of liability that may not have led to an indictment of Walmart at all (as opposed to an indictment of Dr. Diamond, for example). *C.f. In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 21 (S.D.N.Y. 2016) (concluding a Wells Notice and SEC investigation were "not pending or threatened litigation," putting them outside ASC 450's obligation to disclose "threatened litigation [as] a qualifying loss contingency"). The "progress of the case" was limited to document requests and search warrants, and there is no allegation of any discussions with prosecutors during this period that might indicate a threat of litigation prior to AUSA Rattan's communication. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93–94 (2d Cir. 2016) (requiring disclosure of a possible government claim as a loss contingency at least by the time the government "alluded to [the entity's] improper actions" in a criminal complaint relating to a specific government contract, the government announced reviews of that contract, individual employees had been indicted by the government and indemnified by the entity, and an audit made the entity aware of its liability for breaching that contract and the possible extent thereof); *Secs. & Exch. Comm'n v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 21 (D.D.C. 2017) (distinguishing *Lions Gate* because a "federal civil complaint . . . was actually pending" against the entity, as opposed to the "mere existence of an open investigation," which would not have triggered ASC 450). The complaint does not suggest Walmart had similar cases from which it could infer possible liability, other than the situation involving the MOA, which "imposed no fines and [did not require] Walmart [to] admit[] . . . wrongdoing," Appellee's Br. 4, so Walmart's prior experiences did not indicate a reasonable possibility of a loss from this case, either.

Consider how one District Court dismissed a similar ASC 450 claim brought with similar facts:

> "According to the plaintiffs, MTS could have easily estimated its loss; they say that MTS knew "(i) [it] had violated the FCPA, (ii) it was probable that its violations would result in a material loss to MTS, and (iii) of the dollar amount of corrupt bribes the Company had paid in violation of the FCPA, and could thus reasonably estimate the amount of that loss" as soon as it was aware that the DOJ was investigating. (*Id.* at ¶ 160.) In my view, the circumstances were far less obvious and straightforward. *When MTS learned of the investigation, it could not predict the outcome: whether the government would file charges, what those charges would be, whether the government would have agreed to a [deferred prosecution agreement] at all and, if it did, what its terms would be. Nor could the company predict whether it would be willing to settle, or would contest the charges, assuming there were charges.* And, at that point, MTS was not cooperating with the DOJ and could not predict whether it would ultimately receive cooperation or remediation credit."

*Salim v. Mobile Telesystems PJSC*, No. 19-cv-1589, 2021 WL 796088, at *7 (E.D.N.Y. Mar. 1, 2021) (emphasis added), *aff'd*, 2022 WL 966903 (2d Cir. Mar. 31, 2022). As in *Salim*, indeterminacy is key here—Walmart could not predict the

outcome of the investigations, what the charges would be, or what a settlement would look like. That Walmart had prior run-ins with the law where the grounds of its potential liability were clearer did not mean it could predict a disclosable contingent liability here.

Accordingly, plaintiffs' GAAP theory fails during this part of the class period.

## C.

That leaves us with Walmart's disclosures on and after June 4, 2018. Because the complaint does not plausibly allege these disclosures were misleading or otherwise insufficient, neither of plaintiffs' theories of fraud can succeed from June 4, 2018 to the end of the class period.

From its first-quarter 2018 10-Q to the end of the class period, Walmart's disclosures stated Walmart "has also been responding to subpoenas, information requests and investigations from governmental entities related to nationwide controlled substance dispensing practices involving the sale of opioids," and Walmart could "provide no assurance as to the scope and outcome of these matters and no assurance as to whether its business, financial condition or results of operations will not be materially adversely affected." App. 159. Walmart argues, and the District Court agreed, those disclosures "were entirely adequate" because they informed investors of 1) the fact that Walmart was subject to an investigation, 2) the subject matter of the investigation, *i.e.*, opioids and controlled substances dispensing practices, and 3) the investigation "could ultimately result in liability for the Company" that it could not assure would not be material.

Appellee's Br. 35–36.

Plaintiffs respond that the disclosure's lack of detail renders it unsatisfactory. They contend, first, that ASC 450's requirement that Walmart "disclose the 'nature of the contingency'" specifically required Walmart to disclose it was possibly subject to "a criminal penalty," and second, that Walmart's more detailed disclosure of "numerous investigations and litigations in [its] financial statements that were far less threatening than the Investigations" obligated them to disclose EDTX's CSA investigation in the same detail. Appellant's Br. 48.

Neither response is persuasive. First, ASC 450 does not require the granularity plaintiffs suggest—*i.e.*, Walmart did not need to explain that the "nature of the contingency" is not only losses that could be incurred after a government investigation, but specifically a criminal penalty. *See, e.g.*, 1 Donald Resseguie, Applying GAAP and GAAS § 8.09[3][b] (2025) ("A reporting entity must use terminology that is *descriptive of the nature of the accrual*. For example, the disclosure should indicate *if there is an estimated liability, or a liability of an estimated amount*." (emphasis added)). Walmart's disclosure was adequate, describing that it was under investigation, what it was for, and that there was not an estimated liability. Nor does the complaint plausibly allege Walmart was yet privy to information that a criminal penalty *was* necessarily the "nature of the contingency" at these stages, since not every investigation—nor even every indictment—leads to a criminal penalty, as opposed to a deferred prosecution agreement, another form of settlement, or, as here, no action at all. In our reading, Walmart's disclosure included "the nature of the contingency"—that is, it was subject to an investigation into a

specific area of its operations that could lead to losses—and "a statement that" "an estimate of the possible loss or range of loss . . . could not be made." ASC 450-20-50-3. This detail also sufficed to make the disclosures' general "Contingencies" statement not misleading; if plaintiffs are right that the investigations *were* a liability that could be material at this point in the class period, Walmart explicitly disclosed them as such.

Second, that a company describes one item in more detail than another does not make the less detailed description fraudulent. The securities laws do not require disclosure of all material facts in *equal* detail. Nor should they. Companies do not always have the same information or certainty about all events included in their disclosures, and neither the law nor the market encourages companies to disclose down to the lowest common denominator. *See generally Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 195 (2015) (observing that a speaker can avoid misleading listeners by "mak[ing] clear the real tentativeness" of her assertion).

We are also convinced Walmart's disclosure passes muster under *Omnicare*, which lays out scenarios in which opinion statements can be fraudulent.[5] Plaintiffs can plead an

---

[5] We consider the statement added in the June 4, 2018 disclosure a statement of opinion. An opinion statement typically includes "words like 'I think' or 'I believe'" that "convey some lack of certainty as to the statement's content." *Omnicare*, 575 U.S. at 187. The statement here, that Walmart could "provide no assurance as to the scope and outcome of these matters" or "as to whether its business . . . will not be

opinion is false or misleading by plausibly alleging any of three scenarios: (1) the speaker does not "actually hold[] the stated belief," (2) the opinion statement "contain[s] embedded statements of fact" that are untrue, or (3) there are "particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context," and those facts are "in the issuer's possession at the time." *Omnicare*, 575 U.S. at 184–186, 189, 194; *see also Prudential*, 70 F.4th at 685 ("*Omnicare*'s framework for evaluating opinion falsity applies to claims under § 10(b) for violations of Rule 10b-5.").

On the facts pled in the complaint, if this disclosure is an opinion statement (both parties assume so), it is not fraudulent. The first *Omnicare* scenario is inapplicable because the complaint does not plausibly suggest Walmart or the individual defendants subjectively thought Walmart *could* provide "assurance as to the scope" of the investigations or "as to whether [Walmart's] business . . . [would] be materially adversely affected." App. 159. There is also no embedded, untrue statement of fact that would put this in the second scenario. And *Omnicare's* third scenario is also not met here because Walmart did not omit a fact in its possession that would make its statement misleading. True, Walmart could have disclosed its full history with government authorities regarding dispensing controlled substances here. But "[a]n opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other

_____

materially adversely affected," conveys that lack of certainty. App. 159.

way," because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts." *Omnicare*, 575 U.S. at 189–90. And Walmart did not need to disclose every fact that went to its opinion unless the omission of those facts made the opinion misleading.

Plaintiffs argue further that Walmart's filings were misleading because they omitted Walmart *was*, in fact, violating the CSA and engaging in the conduct for which it was being investigated. But the Second Circuit, in an opinion we find persuasive, concluded—where a company disclosed to investors it was under investigation for facilitating tax evasion—the company did not *also* need to disclose that it was "engaged in an ongoing tax evasion scheme." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). Rather, the company did enough "[b]y disclosing its involvement in multiple legal proceedings and government investigations" and "indicating that its involvement could expose [it] to substantial" penalties—just as Walmart did here. *Id.*

Accordingly, the complaint does not plausibly allege Walmart's disclosures from June 4, 2018 to the end of the class period were misleading or violated ASC 450.[6] We agree with

---

[6] We do not hold—and need not—that on any given date after the 2018 first-quarter 10-Q, this investigation became a loss contingency Walmart needed to disclose or a "liability" that was "reasonably possible and may be material." App. 154–55. If it did, then Walmart timely disclosed it; and if it did not, then Walmart's disclosure was safely overinclusive throughout the class period.

the District Court that "no investor could read" these
disclosures "without understanding what was true"—
"Walmart potentially faced losses" depending on the result of
the investigations, and "the scope of any such losses was
indeterminate." App. 21.

## IV.

Finally, plaintiffs contend the court abused its
discretion in denying leave to amend. Plaintiffs' proposed
amendment would have added to their complaint allegations
from a parallel derivative lawsuit against Walmart in Delaware
Chancery Court over similar conduct. This would have
included evidence gleaned from discovery in that case to
support the inference that "Walmart's board of directors,
including defendant McMillon . . . knew Walmart was
violating the CSA and MOA." App. 1065. The court reasoned
amendment would be futile because plaintiffs' proposed
amendments sought to "bolster the [Second Amended
Complaint's] *scienter* allegations," but the court dismissed that
complaint without reaching scienter. App. 29–30 (emphasis
added). Plaintiffs argue this was an abuse of discretion because
"falsity"—*i.e.*, the first element of a securities fraud claim—
"and scienter are inextricably intertwined in this case: whether
Defendants' statements were misleading depends upon
whether they had a reasonable basis to conclude the
Investigations did not threaten a material liability."
Appellant's Br. 57.

Falsity and scienter are intertwined in many cases. But
here, the scienter allegations in plaintiffs' Proposed Third
Amended Complaint would not have contributed to their
falsity allegations—and plaintiffs' brief in support of

amendment characterized any new facts as primarily addressing scienter. *See* App. 1415 ("The Proposed [Third Amended Complaint] bolsters the SAC's strong inference of scienter."). Adducing evidence that McMillon and Biggs knew of Walmart's checkered history with the CSA, all before the class period, does not change the fundamental flaw in the complaint—on these facts, Walmart did not wrongly judge whether *this* investigation was a liability that was both "reasonably possible" and potentially material, so its disclosure was not misleading. This is especially so given the complaint does not show the MOA resulted in any material losses. None of the facts plaintiffs would incorporate from the derivative complaint suggest the EDTX investigations were a more reasonably possible, or potentially material, liability than they were without those facts.

Accordingly, even if we were to agree with plaintiffs that the court "implicitly consider[ed] scienter in dismissing the SAC," Appellant's Br. 57, we explicitly do not consider scienter in affirming that dismissal. Accordingly, we agree leave to amend would have been futile.

## V.

Plaintiffs' complaint alleges what they describe as a serious pattern of wrongdoing by Walmart in its opioids dispensing practices. Our opinion should not be read to pass judgment on its seriousness. Although the EDTX investigation did not lead to any charges, Walmart has faced, and may continue to face, public and private enforcement actions, scrutiny, and accountability for its role in the nationwide opioid epidemic. *See In re Nat'l Prescription Opiate Litigation*, 589 F. Supp. 3d 790, 803–07 (N.D. Ohio 2022);

Appellee's Br. 9 ("In December 2020, DOJ brought a civil suit against Walmart alleging violations of the CSA. That civil case remains ongoing." (citations omitted)).  And its liability so far has numbered in the billions of dollars.  *See, e.g.*, *Walmart Reaches Opioid Settlement Agreements with All 50 States*, Walmart News (Dec. 20, 2022), https://corporate.walmart.com/news/2022/12/20/walmart-reaches-opioid-settlement-agreements-with-all-50-states.

But although Walmart is a public company, and although plaintiffs allege wrongdoing on its part, not everything is securities fraud[7]—a public company's mischief is not actionable under the securities laws unless the company's disclosures contain a misrepresentation or misleading omission of material fact about that mischief.

That is not the case here.  Accepting the allegations in the complaint, at least as far as ASC 450 and its "Contingencies" statements are concerned, Walmart did what it had to do to avoid making them misleading—it did not disclose an investigation in its early stages whose contours were unclear; once it learned an indictment could come, it immediately arranged a meeting with prosecutors to clarify its scope and probability; and once the contours of the investigation were clearer, Walmart disclosed it was under investigation, what it was under investigation for, and that it faced possible losses relating to that investigation whose extent

---

[7] Matt Levine, *Silence Is Not Securities Fraud*, Bloomberg (Apr. 15, 2024), https://www.bloomberg.com/opinion/articles/2024-04-15/silence-is-not-securities-fraud.

it could not estimate.

Accordingly, plaintiffs do not plausibly allege Walmart's disclosures were misleading, and we will affirm without reaching the remaining elements of the claim.[8]

For the foregoing reasons, we will affirm.

---

[8] We also reject plaintiffs' argument that Walmart made a misleading statement under Item 105. In their briefing, plaintiffs concede the court's conclusion that Walmart's risk disclosures complied with Item 105—instead, they argue Walmart's "statements describing the risks associated with Walmart's pharmacy operations were misleading, *irrespective* of Item 105." Appellant's Br. 33. But we do not see how a reasonable investor could read Walmart's Item 105 disclosures as making any representation about an early-stage government investigation, particularly when the "Contingencies" disclosures were otherwise adequate. We do not reach plaintiffs' allegations concerning Item 103 because plaintiffs do not dispute that aspect of the court's decision. App. 25–26.

Because a violation of Section 20(a) requires an underlying violation of Section 10(b), and we will affirm the dismissal of the Section 10(b) claim, we will also affirm the dismissal of the Section 20(a) claim. *See* 15 U.S.C. § 78t(a).